## Commonwealth, Appellant, *v.* Yorktowne Paper Mills, Inc.

Argued May 25, 1967. Before BELL, C. J., MUS-MANNO, JONES, EAGEN, O'BRIEN and ROBERTS, JJ.

*Edward T. Baker,* Deputy Attorney General, with him *William C. Sennett,* Attorney General, for Commonwealth, appellant.

*Lewis H. Markowitz,* with him *Robert H. Strickler,* and *Markowitz, Kagen & Griffith,* for appellee.

*Richard C. Fox,* with him *McNees, Wallace & Nurick,* for amicus curiae.

OPINION BY MR. JUSTICE MUSMANNO, June 29, 1967:

The Yorktowne Paper Mills, Inc. is engaged in the manufacture of paper and allied products. In the manufacturing process it uses a chemical known as "A-Gel", a coagulating aid, and a chemical known as "Remox", a softening agent, which are placed in the boilers for the purpose of eliminating scale and corrosion and thus prolonging the life of the boilers and maintaining them in good operating condition. The boilers produce the steam required in the manufacture of paper board. The steam dries the paper, heats the water in the heater to a 140° (Fahrenheit) temperature, and runs the turbine which operates the paper machine.

Yorktowne also employs a chemical known as "Du-Jet", a cleaning agent, which is applied to the felt conveyor belt to keep it free and clear of foreign material that would otherwise adversely affect the drainage of water through it. As the liquid paper is carried by the belt through the wet end of the paper machine, the water drains through the felt and is used again. Keeping the felt clean is an important matter.

Yorktowne purchased a considerable quantity of these chemicals "A-Gel, "Remox: and "Du-Jet" from March 7, 1956 up to and including May 31, 1959, and the Commonwealth of Pennsylvania made an assessment against it for a sales and use tax on the purchases.

The Commonwealth also levied a sales and use tax on Yorktowne's purchases of lumber, nails and metal bands used in constructing pallets employed in transporting the company's products. A pallet or skid consists of three parallel pieces of lumber with four boards, spaced about one inch apart, nailed across them, as if for flooring, with four boards nailed across the back. The manufactured rolls are then placed on the pallets or skids and secured thereby by placing

metal bands around the entire unit. Yorktowne's customers (wholesalers) are not required to return the skids or pallets since they are not reusable, being roughly constructed of an extremely poor grade of lumber.

Yorktowne paid the sales and use tax on the purchase of the above designated items, but immediately filed a petition for refund which was denied by the Board of Finance and Revenue. It then appealed to the Court of Common Pleas of Dauphin County, which court, after hearing, and after determination of certain procedural issues which had been advanced by the Commonwealth, not here material, ordered the Department of Revenue to refund the sales and use tax of $852.36 paid by Yorktowne under protest, together with the interest and penalties applicable thereto. The Commonwealth has appealed to this court.

The Selective Sales and Use Tax Act (Act of March 6, 1956, P. L. (1955) 1228, as amended, 72 P.S. §3403-1 et seq., imposes a sales or use tax on certain designated tangible personal property. However, Section 2 (n) (4) (c) (72 P.S. §3403-2 (n) (4) (c)) specifically provides: "That the term 'use' shall *not* include. . . . The use or consumption of tangible personal property including, but not limited to machinery and equipment and parts and foundations therefor, and supplies or the obtaining of the services described in subclauses (2), (3) and (4) of this clause directly in any of the operations of . . . the manufacture *of personal* property . . ." (Emphasis supplied)

The Commonwealth contends that the chemicals purchased to keep the boiler and the conveyor belt in good operating condition are not used "directly" in the manufacturing operations of Yorktowne. The regulations of the Department of Revenue set up administrative tests to be applied in determining whether or not tangible property is used "directly" in the manufactur-

ing operations. Regulation 225 provides: "In determining whether particular property is 'used directly', consideration must be given to the following factors: a. The physical proximity of the property, while in use, to the production process; b. The proximity of the time of use of the property to the production process; and, c. The active causal relationship between the use of the property and the production of a manufactured product. In order to meet the direct use test, it is essential that the taxpayer establish such active causal relationship. The fact that property is essential to the conduct of a manufacturer's business either because its use is required by law or is a matter of reasonable practicality, does not of itself mean that the property is 'used directly' in manufacturing. On the other hand, the fact that a product conceivably could be produced in some manner which does not involve use of the property, is not conclusive that the property in question is not 'used directly' in operational activities of manufacturing."

The Commonwealth maintains that the chemicals used in the boiler which produces the steam which in turn produces the power which in turn runs production machinery which in turn works on the manufactured product is far removed from the manufacturing operation and that therefore the "physical proximity, the proximity of the time of use, and the active causal relationship are completely divorced from the manufacturing operation." Though at first blush, the Commonwealth argument would seem to have merit, a close analysis would show it to have no basis in fact, or reason.

Since it is admitted that the boiler itself is exempt from taxation, the inevitable conclusion follows that it is admitted that the boiler is directly used in the manufacturing operation. The chemicals sought to be taxed are employed to keep the boiler in good operating con-

dition. Simple logic leads to the conclusion that the chemicals are thus an important and integral part of the manufacturing operation, and that part a direct one. All this makes possible the emission of steam. If the boilers are not in good condition there can be no steam. It is vain to argue that the boilers could possibly be kept in good condition by other means, because Regulation 225, above quoted, provides "the fact that a product conceivably could be produced in some manner which does not involve use of the property, is not conclusive that the property in question is not 'used directly' in operational activities of manufacturing."

It is true that the Regulation 225 also states that "the fact that property is essential to the conduct of a manufacturer's business, either because its use is required by law or is a matter of reasonable practicality, does not of itself mean that the property is 'used directly' in manufacturing." But it is to be noted that, apart from the essentiality of a clean felt conveyor belt and a healthy boiler capable of producing steam indispensable in the Yorktowne's manufacturing process, the use of the chemicals required to maintain in good working condition the boiler and conveyor belts became, in fact, an integral part of the manufacturing process. It is obvious that, contrary to the Commonwealth's assertion, there were physical proximity, proximity of time and use and an active causal relationship between the use of the indicated property and the production of the manufactured product.

As to the imposition of a sales and use tax on Yorktowne's purchase of lumber and nails and metal bands for the skids and pallets used in conjunction with the transportation and delivery of its manufactured product to Yorktowne's wholesale customers, we are of the view that all this comes within the exclusion provided for in §203 (j) of the Act, which excludes from tax the

use of "wrapping paper, wrapping twine, bags, cartons, tape, rope, labels, non-returnable containers and all other wrapping supplies, when such use is incidental to the delivery of any personal property." The skids or pallets were in effect "non-returnable containers" or "cartons"; they were the type of "wrapping supplies" to which the manufactured product (heavy rolls of paper sometimes weighing between one-half tons and several tons) lent itself. It seems clear that the Legislature intended the exclusion to apply to all wrapping materials, of whatever nature or form, so long as the materials were in fact used to provide a container for the purpose of facilitating the delivery of the manufactured product to the purchaser. The purpose serviced and not the exact type of material employed was intended to govern.

Decree affirmed; each party to bear own costs.

Mr. Justice COHEN took no part in the consideration or decision of this case.