3 N.J. Tax 482 (1981)
SPENCER GIFTS, INC., PLAINTIFF,
v.
DIRECTOR, DIVISION OF TAXATION, DEFENDANT.
Tax Court of New Jersey.
November 12, 1981.
*484 Ronald A. Wagenheim, for plaintiff (Cooper, Perskie, Katzman, April, Niedelman & Wagenheim and P.J. DiQuinzio and Richard P. Wild, members of the Pennsylvania Bar, attorneys).
Joseph C. Small, for defendant (James R. Zazzali, Attorney General of New Jersey, attorney).
RIMM, J.T.C.
Spencer Gifts, Inc. challenges a deficiency assessment under the New Jersey Sales and Use Tax Act, N.J.S.A. 54:32B-1 et seq., of $199,960.79 plus interest for the years 1974 through 1976, and the denial of refund claims in the amounts of $19,648.61, $29,116.90 and $24,019.53 for sales taxes paid for the years 1976, 1977 and 1978, respectively.
The challenge is based on the taxpayer's position that its purchase of certain printed materials is exempt from taxation as "wrapping paper," "wrapping supplies," "nonreturnable containers" or "labels" under the provisions of N.J.S.A. 54:32B-8(o), and that the rental of computer mailing lists by the taxpayer is exempt from taxation as the rental of intangible property or the purchase of a nontaxable service.
Plaintiff is a Delaware corporation with its principal place of business in New Jersey. For all periods related to this proceeding, plaintiff engaged in the business of selling merchandise by mail order to customers throughout the United States.
By his notice of assessment dated December 28, 1977, defendant notified plaintiff that he had made a deficiency assessment *485 for the period of January 1, 1974 to December 31, 1976 of $399,045.92 as follows:

 Sales/Use Tax $ 275,123.86
 Interest 110,165.87
 Penalty 13,756.19
 ____________
 Total $ 399,045.92

On March 10, 1978 a memorandum brief in support of plaintiff's protest against the notice of assessment and in support of the refund claim was filed with defendant. On March 22, 1978 plaintiff's representatives protested the conclusions reached in the notice of assessment at a hearing before a representative of defendant pursuant to N.J.S.A. 54:32B-19, and defendant issued his determination in the form of a letter to petitioner dated April 13, 1978. On April 20, 1978 plaintiff paid, by certified check in the amount of $335,021.47, the tax called for by the determination: $275,123.86, plus interest computed to April 20, 1978, $59,897.61. Plaintiff's representatives had been informed that, upon receipt of such payment, one-half of the interest and all of the penalty set forth in the determination would be waived by defendant. The letter accompanying payment filed on plaintiff's behalf stated that plaintiff's payment was being made under protest and that the present action would be brought.
Plaintiff's petition of appeal was filed with the Division of Tax Appeals on June 7, 1978. The matter was subsequently transferred to the Tax Court. N.J.S.A. 2A:3A-26. The plaintiff appealed defendant's determination dated April 13, 1978 with regard to the assessments for 1974, 1975 and 1976, and also appealed defendant's denial of its refund claims for 1976 and 1977. The petition claimed that the determination (a) erroneously holds plaintiff subject to use tax with respect to the purchase of mailing wrappers, and (b) erroneously holds plaintiff subject to use tax with respect to the rental of computer mailing lists.
On or about December 27, 1979 plaintiff filed a claim for a refund for 1978 in the amount of $24,019.53. The claim was denied by defendant's letter dated June 16, 1980. On July 8, *486 1980 plaintiff amended its petition of appeal, treated as a complaint in the Tax Court, to include an additional claim for refund of sales and use tax for 1978.
It is stipulated that plaintiff should recover $157,522.03 with respect to the advertising wrapper issue if it prevails on that issue. It is further stipulated that plaintiff should recover $158,715.27 with respect to the mailing list issue if it prevails on that issue.
The matter is before the court for disposition without trial on an agreed stipulation of facts, agreed exhibits and briefs submitted by each party in accordance with the pretrial order and R. 8:8-1(b).

I

The Wrappers
With regard to the wrappers or mailing labels, the parties stipulated, in pertinent part, as follows:
1. During the calender years 1974 through 1976 plaintiff purchased certain printed paper for use as wrappers and mailing labels for its merchandise catalogs and to serve advertising and promotional purposes. The printed paper was referred to in the stipulation submitted to the court as "advertising wrappers" without any concession by defendant that the objects are wrapping paper, labels or nonreturnable containers under N.J.S.A. 54:32B-8(o), and without any concession by plaintiff that the objects are not wrapping paper, labels or nonreturnable containers under that section of the statute.
2. The advertising wrappers are tangible personal property with the following physical characteristics:
a. They are generally printed in black and white and in colors on both sides of 50 lb. offset paper.
b. They are printed two to a sheet. Sheets are 17" high and from 12 3/8" to 14 3/16" wide.
c. The advertising wrappers themselves are from 7 1/2" to 7 3/4" high and from 13 3/8" to 14 3/16" wide.
*487 d. The width of the sheets and advertising wrappers depends on whether the wrapper has a flap and, if so, the width of the flap.
e. The sheets are perforated between wrappers and punched with sprocket holes on the right- and left-hand sides. The sprocket holes enable plaintiff to run the sheets through its computer-printer.
3. The advertising wrappers are printed with plaintiff's return address, a bulk rate postage permit imprint and promotional or advertising matter intended to increase the customers' response to plaintiff's catalogs.
4. Plaintiff runs the printed sheets through its computer-printer, which types the recipient's name and address and a "personalized" message on each advertising wrapper. The addressed and personalized advertising wrappers are separated along perforations and sent in bulk to plaintiff's catalog distributor in Illinois where they are wrapped around each catalog.
5. In accordance with Postal Service regulations, the catalogs, bearing the addressed advertising wrapper with a postage permit imprint, are entered as bulk third-class mail by plaintiff's catalog distributor at postoffices outside of New Jersey.
6. The advertising wrappers serve the following purposes:
a. They bear the customer's name and address and a bulk rate postage permit imprint to permit delivery of the catalogs by mail.
b. They are wrapped around and protect the catalogs from damage in transit.
c. They bear promotional or advertising matter intended to increase the customer's response to the catalogs.
7. The catalogs could be mailed without the advertising wrappers provided that an address label and a bulk rate postage permit imprint appeared on the outside of the catalog in accordance with Postal Service regulations.
8. Less than 8% of the advertising wrapper actually contains information necessary for the delivery of the catalogs by mail.
*488 9. During the period 1974 through 1976 plaintiff purchased all of its advertising wrappers from two firms: Scanforms Co. and the Cyril Scott Company.
10. Plaintiff would incur less cost if it used small address labels with no promotional or advertising matter instead of advertising wrappers.
11. Plaintiff's catalogs are distributed free of charge to the recipients.
Submitted with the stipulation were five exhibits relating to the wrapper issue. Three of them are relevant: a typical advertising wrapper before being addressed, a typical advertising wrapper after being addressed, and a catalog with the wrapper attached. The two unattached wrappers are each 15 7/16" wide and 7 15/16" high. The width measurement includes sprocket holes on both edges of the wrapper. In addition to an address one wrapper contains messages directed to the addressee. The wrapper attached to the catalog is 14 1/2" wide and 7 3/4" high and is affixed to the catalog by being stapled to the spine of the catalog in the same manner in which all the pages and the cover of the catalog are stapled together. The sprocket holes had been removed. When attached to the catalog the wrapper is folded in such a way that it is approximately the same size as the catalog cover. The manner of folding results in three sheets, or six pages, two of which pages are at the back of the catalog, two at the front of the catalog, and two on a flap folded over at the front of the catalog. The address is on the back page in a space 5 3/8" wide and 2 15/16" high, which also contains the return address of the taxpayer and the bulk rate postage permit imprint. In addition, three of the six pages contain messages specifically directed to the addressee.
The New Jersey Sales and Use Tax Act, N.J.S.A. 54:32B-1 et seq. (hereinafter the act), imposes a tax upon "the receipts from every retail sale of tangible personal property," N.J.S.A. 54:32B-3(a), unless otherwise provided in the act. A retail sale is defined as "[a] sale of tangible personal property to any person for any purpose, other than... for resale either as such or *489 as converted into or as a component part of a product produced for sale by the purchaser." N.J.S.A. 54:32B-2(e)(1). The tax is also imposed on advertising materials or services. N.J.S.A. 54:32B-3(b)(5). If the tax is not collected by the vendor, the Director may collect it from the purchaser. N.J.S.A. 54:32B-14(b). It is presumed that the sale of tangible personal property is subject to the tax, and the burden of proving an exemption is upon the person required to collect the tax or upon the customer. N.J.S.A. 54:32B-12(b). The fundamental approach of the act is that ordinarily all defined transactions shall bear their just and equal share of the public burden of taxation. As was said in Princeton Univ. Press v. Princeton Borough, 35 N.J. 209, 172 A.2d 420 (1961):
As the existence of government is a necessity, taxes are demanded and received in order for government to function. 51 Am.Jur., Taxation, § 9, p. 42. Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption. [Citation omitted] The burden of proving a tax-exempt status is upon the claimant. [at 214]
Plaintiff contends that the item referred to in the stipulated facts as a wrapper or mailing label is not taxable because it is a mailing wrapper exempt from taxation pursuant to N.J.S.A. 54:32B-8(o), now N.J.S.A. 54:32B-8.15, and hereinafter referred to as section (o). This section provides that receipts from certain transactions are exempt from tax under N.J.S.A. 54:32B-3(a) and N.J.S.A. 32B-6 as follows:
(o) Sales or use of wrapping paper, wrapping twine, bags, cartons, tape, rope, labels, nonreturnable containers, reusable milk containers and all other wrapping supplies when use is incidental to the delivery of any personal property.
Plaintiff claims that its wrapper qualifies as "wrapping papers," "labels," "nonreturnable containers" and "wrapping supplies" because it is wrapped around the catalog and serves as a mailing label and that it is of no consequence that only 8% of the wrapper contains mailing information, for the item can qualify as a label whether it consists of a simple name and address or a more elaborate device such as plaintiff's. Plaintiff contends that the wrapper is not taxable as advertising matter under N.J.S.A. 54:32B-3(b)(5) even though it contains promotional material thereon. It claims that the fact that the wrapper serves a dual purpose does not preclude exemption under section *490 (o), for the statute does not require that the wrapper be "exclusively used" or used "solely for" the delivery of personal property. Plaintiff also asserts that the wrapper is not disqualified from exemption by reason of the fact that the catalog is distributed without charge. The exemption provision only requires "delivery" and not a sale of the personal property.
Defendant responds that the printing and advertising services incurred for the production of the mailing wrapper are taxable under N.J.S.A. 54:32B-3(b)(5). Defendant also contends that the principal use of the mailing wrapper is determinative of its character. He asserts that its principal function is of a promotional nature, rather than as a label or a wrapper, and therefore it does not qualify for the exemption under section (o). He concedes that this section does not impose an exclusivity test, but claims that it does require that the item have as its principal function one of the enumerated uses in the section. Defendant further contends that since the catalogs are distributed without charge, the exemption provision does not exempt the wrapper, for it only exempts labels, wrappers and similar items when their use is incidental to the sale of personal property.
No New Jersey cases define the pertinent words of section (o) but, as Judge (now Justice) Handler said in East Orange v. Livingstone Tp., 102 N.J. Super. 512, 246 A.2d 178 (Law Div. 1968), aff'd 54 N.J. 96, 253 A.2d 546 (1969):
In ascertaining the meaning of a statute, the language employed should be given its ordinary and common significance. Lane v. Holderman, 23 N.J. 304 [129 A.2d 8] (1957). It is to be recognized, however, that "words are inexact tools at best, [and] resort may freely be had to the pertinent constitutional and legislative history for aid in ascertaining the true sense and meaning of the language used." Lloyd v. Vermeulen, 22 N.J. 200, 206 [125 A.2d 393] (1956). In brief, the term [being considered] must be understood in its usual significance and in a manner which will sensibly effectuate the salient statutory objective.... [at 536, 537, 246 A.2d 178]
The words "wrapping paper," "labels," "nonreturnable containers" and "wrapping supplies" in the exemption provision of the act must therefore be understood in their usual significance and in a manner which will sensibly effectuate the salient statutory objective of insuring that all property and all transactions bear their proper share of the tax burden.
*491 The noun "container" means "one that contains; esp.: a receptacle or a flexible covering for the shipment of goods." Webster's New Collegiate Dictionary 242 (1979). The verb "contain" denotes, variously, "1: to keep within limits: hold back or hold down: as a: restrain, control... 2 a: to have within: hold ... 3 ... b: enclose, bound." Id. The verb "wrap," of which "wrapping" as used in the statute is the participle, means "1 a: to cover esp. by winding or folding b: to envelop and secure for transportation or storage ... d: to coil, fold, draw, or twine about something... 4: to enclose as if with a protective covering." Webster's New Collegiate Dictionary 1343.
In Commonwealth v. Yorktowne Paper Mills, Inc., 426 Pa. 18, 231 A.2d 287 (1967), the Pennsylvania Supreme Court construed an exemption provision similar to section (o). The question presented was whether the purchases of lumber, nails and metal bands for the construction of pallets and the securing of the taxpayer's paper products thereto were exempt as "nonreturnable containers," "cartons" or "wrapping supplies." The court held they were exempt and said:
The skids or pallets were in effect "nonreturnable containers" or "cartons"; they were the type of "wrapping supplies" to which the manufactured product (heavy rolls of paper sometimes weighing between one-half tons and several tons) lent itself. It seems clear that the legislature intended the exclusion to apply to all wrapping materials, of whatever nature or form, so long as the materials were in fact used to provide a container for the purpose of facilitating the delivery of the manufactured product to the purchaser. The purpose serviced and not the exact type of material employed was intended to govern. [426 Pa. at 24, 231 A.2d at 289-290; emphasis supplied]
In State v. Reynolds Metal Co., 263 Ala. 657, 661, 83 So.2d 709, 712 (Sup.Ct. 1955), the court held that the purchase of reels and spools was exempt from the use tax, for they qualified as "containers" within the definition of the exemption provision. The taxpayer used such items to store and deliver its manufactured wire and cable and thus "they were necessary to make the cables and wires marketable and in a sense contain them."
In Custom Beverage Packers, Inc. v. Kosydar, 33 Ohio St.2d 68, 73, 294 N.E. 672, 676 (1973), the Supreme Court of Ohio held that unbound pallets used to transport cases of soft drinks were *492 not exempt as "packages" within the statutory definition. The statute defined packages as including "bags, baskets, cartons, crates, boxes, cans, bottles, bindings, wrappings, and other similar devices and containers." The court construed this provision as follows:
It is noted that all of the above items which circumscribe and contain whatever is packaged. These items may not necessarily fully enclose, but they do restrain movement of the packaged object in more than one plane of direction. Many are complete enclosures or restraints; however, none of such items would permit movement in more than a single plane of direction. [33 Ohio St.2d at 73, 294 N.E.2d at 675; emphasis supplied]
Thus, the court held the pallets were not packages, for they only prohibit or restrain movement of the cases in one direction. Otherwise, the cases may be freely moved in any direction without harm to the pallet. The court noted, however, that it did not decide whether pallets to which cases or other objects are bound are exempt as packages. 33 Ohio St.2d at 73, 294 N.E.2d at 676.
Subsequently, in Cole National Corp. v. Collins, 46 Ohio St.2d 336, 348 N.E.2d 708 (Sup.Ct. 1976), the court held that display cases and racks were not exempt as "packages" where they were used by the taxpayer to ship initial orders and subsequently used by the retailer to market the taxpayer's products. The taxpayer contended the cases and racks were exempt under Custom Beverage Packers. The court stated:
Although Custom Beverage Packers sets forth an essential characteristic of a package, it does not provide the sole criterion for making such a determination. Not all items that restrict movement in more than one direction are packages. In fact we limited Custom Beverage Packers to its facts by stating...
"We do not here decide whether pallets to which cases or other objects are bound are tax exempt." [46 Ohio St.2d at 338, 348 N.E.2d at 709]
The court then found that the cases and racks had a principal function as a marketing aid, and the packaging function was incidental thereto. The court held:
Tested against these principles [strict construction of exemption statutes and the taxpayer's burden thereunder], taxpayer's arguments must fail. This court does not believe it should focus only on the taxpayer's physical use of the display cases and racks as packages, while ignoring their predominant economic purpose and function as integral parts of an overall marketing plan. We find that the predominant economic purpose of these articles to the taxpayer was to facilitate the marketing of its products, rather than to package same, and therefore the *493 order of the Tax Commissioner, denying a tax exception under R.C. 5739.02(B)(15), was neither unreasonable nor unlawful, and is affirmed. [46 Ohio St.2d at 339, 348 N.E.2d at 710]
The Yorktowne Paper Mills, Inc. and Reynolds Metal Co. cases provide for a functional test. If the container, no matter what its physical characteristics, does in fact contain or hold the product being sold and does facilitate its delivery and marketability, the container, or its components, are exempt at the time that the seller of the product purchases the container. Custom Beverage Packers, Inc. v. Kosydar, supra, refines the functional test and clarifies the nature of the packaging required for exemption qualification, namely that the container restrain the movement of the product in more than one plane.
Cole National Corp. v. Collins, supra, adds an economic test to the functional test. Even if the container packages the product and facilitates its delivery, it is not exempt if it has another predominant economic purpose.
Similarly "label" has been judicially defined:
A label is: "a slip of paper or any other material, bearing a name, title, address, or the like, affixed to something to indicate its nature, contents, ownership, destination or other particulars." U.S. v. Skilken, 293 F. 916, 920 (D.C.S.D. Ohio, W.D. 1923), aff'd sub nom. Skilken v. U.S., 293 F. 923 (C.C.A. 6, 1923). [Citations omitted]
A label has also been defined as:
... [a]n affixation to or marking on a manufactured article giving information as to its nature or quality, or the contents of a material, package or container, or the name of the maker.... [Black's Law Dictionary (5 Ed. 1979), 786]
In Higgins v. Keuffel, 140 U.S. 428, 11 S.Ct. 731, 35 L.Ed. 470 (1891), the court said that a label is intended to designate the article upon which it is placed. A label designates or describes the article to which it is attached and has no value separated from the article. It serves as an advertisement or designation of the subject to which it is attached and indicates the article in the container to which it is affixed.
Based on the stipulation of facts and an examination of the three relevant exhibits, the court finds that the item referred to as a wrapper is not a label, wrapping paper, wrapping supplies or a nonreturnable container and is not entitled to an *494 exemption from taxation under section (o). The item does not wrap or contain the catalog. When affixed to the catalog it is no more than a cover, opening like a cover to any booklet or catalog. Its wrapping or protective function is minimal, for the catalog has a cover and may be opened just as easily in any direction with the wrapper as it may be without the wrapper, and it may be used even with the wrapper on it. Its delivery function is nonexistent. This catalog could be as easily delivered without the wrapper as it is with the wrapper by merely placing a label or the mailing information on its cover.
Although plaintiff's catalog has a cover designated as such, the subject item is a cover for the catalog, or a separate catalog, or additional advertising and promotional material mailed to the taxpayer's customers with its catalog. It could be mailed separately from the catalog and would, except for the few words on it referring to the catalog, have significance by itself to the recipient as advertising or promotional material. The wrapper advertises a mystery gift, a $50,000 super prize and an "elegantly personalized Sheaffer pen and pencil set [for sale for] only $2.99." After the wrapper has had additional information printed on it, it not only contains the name and address of the addressee to whom the catalog is to be mailed, it also expresses wonder "why anyone would not want to enter [plaintiff's] sweepstakes." There is also printed "an important message from" plaintiff to the addressee, listing the names of other persons who could enter the sweepstakes and urging the addressee to enter "at once." The wrapper submitted as an exhibit which is attached to the catalog is similar in form to the other wrapper exhibits but advertises a "super overstock sale" and tells the addressee that she may have to be excluded from those who will receive catalogs in the future because plaintiff's records do not show that the addressee has made any purchases from plaintiff.
The item is advertising or promotional material. By its use the taxpayer actually sends out two catalogs in one mailing. The court finds as a fact that the item is used to convey information to the addressee.
*495 Plaintiff argues that the mere fact that the wrapper is elaborate, that it contains advertising matter or that it otherwise displays information relating to plaintiff company should not make the wrapper taxable. Many companies, plaintiff argues, use elaborate labels advertising their names and products, and the fact that plaintiff chooses to use an elaborate label rather than a plain wrapper should not disqualify the item from the exemption. Plaintiff's argument is without merit. The wrapper it uses is not merely an elaborate label giving customers information about the name of the company or generally indicating the nature of its products. The wrapper is, in effect another catalog or a part of the main catalog and is not tax exempt merely because there is a place for a mailing label on it. When the item is attached to the catalog it becomes part of the catalog and serves the same purpose for plaintiff as the catalog serves. It has its own purpose separate and apart from any function as a label or wrapper. If mailed to plaintiff's customers by itself it would have meaning to them by virtue of the messages and advertising contained on it. In order to be exempt under section (o), a label, wrapper or container should have no meaning, use or purpose to the recipient without the product or item it contains, wraps or labels. Cf. Higgins v. Keuffel, supra. The mere presence on one page of an area for the customer's address, the bulk rate postage permit imprint, and return address does not change its nature any more than attaching a label to a magazine for mailing purposes makes the magazine's cover a wrapper under the law, or any more than providing such an area on the cover of a catalog itself makes the cover a wrapper. Coincidentally, one of the exhibits submitted in connection with the computer mailing list issue, infra, is a catalog of another mail order company submitted to the court to demonstrate the control method used in connection with the lists. On the cover of that catalog is an area of approximately the same size as the address area on plaintiff's wrapper, in the same general format and containing essentially the same information, such as a return address, the customer's address and the bulk rate postage print imprint. The court doubts that plaintiff *496 would argue that the placing of the label area on the cover of that exhibit would change the cover of that catalog from a cover to a wrapper, with the cost of the cover exempt from taxation, and the court would not reach such a conclusion.
In view of the court's finding of fact that the item referred to as a wrapper is not a label, wrapping paper, wrapping supplies or a nonreturnable container, and the court's conclusion that the purchase of such items by plaintiff is not exempt from tax under section (o), it is not necessary to deal with or to dispose of the parties' arguments relating to the meaning of the word "delivery" in the section.

II

Computer Mailing Lists
With regard to the mailing lists, the parties stipulated as follows:
1. During the calendar years 1974 through 1978 plaintiff leased magnetic tapes containing lists of names and addresses with specific characteristics.
2. The magnetic tapes in question are tangible personal property.
3. It takes approximately one minute for plaintiff's computer to assimilate 10,000 names and addresses from a reel of magnetic tape.
4. The reels of magnetic tape leased by plaintiff contain anywhere from 5,000 to 500,000 names and addresses per reel and the time during which plaintiff's computer is assimilating information from a leased reel of magnetic tape will therefore range from 30 seconds to 50 minutes.
5. The information acquired by plaintiff from the magnetic tapes could be transmitted to plaintiff's computer via telephone, in which case the physical delivery of tapes to plaintiff would be unnecessary, and such information could also be acquired by plaintiff in the form of typed lists.
*497 6. The information acquired by plaintiff from the magnetic tapes is used to add names, addresses and personalized messages to advertising wrappers for plaintiff's catalogs.
7. The fees paid by plaintiff for the right to acquire information from magnetic tapes are based on the amount and quality of information on the tapes.
8. During the period in question the fees paid by plaintiff for the right to acquire information from magnetic tapes ranged from $30 to $35 per thousand names. The cost of renting a reel of tape could therefore range between $150 to $175 for a 5,000-name tape to between $15,000 and $17,000 for a 500,000-name tape.
9. The physical quality of the tape has no effect on the rental price and there is no separate charge to plaintiff for the tape itself.
10. The approximate cost of a reel of "blank" magnetic tape, that is one bearing no information of the type leased by plaintiff, is $10.50 for a 2,400 reel.
11. Generally, plaintiff is permitted only a one-time, limited purpose use of the mailing list information on a given tape, that is, the information may be used for no more than one mailing of a designated item, e.g., a catalog.
12. Generally, plaintiff's agreements with its lessors provide that the lessor does not lease a list being acquired by plaintiff to anyone else during a designated period, typically, one or two weeks before and after the mailing date.
13. Plaintiff's lessors treat their mailing list data contained on leased tapes as valuable and confidential business information.
14. One factor which affects price is the selectivity of information on a tape, such as the specificity of the ages and buying habits of the persons whose names are included on the tape. For example, plaintiff may lease a tape containing only the names of persons who made purchases from a particular company during a designated period.
*498 15. Another factor which affects price is the lessor firm's reputation in the trade for having information of high usefulness and reliability.
16. A premium charge is often made when a tape is age selective. For, example, plaintiff has paid $30 per thousand names for a list of persons who purchased cosmetics from a vendor within the previous six months, and an extra $2.50 per thousand names if the tape only includes persons 40 years of age or older.
17. The fee for a magnetic tape is reduced on account of unusable information, such as an address with an incorrect zip code, and on account of duplicate information, such as a name appearing more than once on a tape.
18. It is a general practice in the industry for mailing list lessors, including many or all of plaintiff's lessors and plaintiff, itself, to protect themselves against unauthorized use of mailing list data by including in each list "decoys"  generally, coded addresses of employees or agents of the lessors  which will indicate improper use of the information and identify the person making such unauthorized use. The decoy procedure generally works as follows. The lessor will include an employee's name on a tape to be leased with modified spelling or initials for identification purposes. If the employee receives literature in the mail from a firm to which the tape was not leased or at a time after the period of permitted use, the lessor will know from the spelling of the decoy's name which of its lessees allowed the information to be used in an improper way.
Submitted with the stipulation were five exhibits relating to the mailing lists issue: three order forms by which plaintiff rented the mailing lists and two samples from mailings indicating control methods used in connection with the lists.
The issue before the court is whether the leasing of computer information is the leasing of tangible personal property subject to tax under either N.J.S.A. 54:32B-3 (sales tax) or N.J.S.A. 54:32B-6 (use tax), or, if intangible personal property and not so subject to tax, whether such leasing is taxable as advertising *499 services under N.J.S.A. 54:32B-3(b)(5). The act taxes every retail sale of tangible personal property unless the sale is specifically exempted from tax, but only specified services are taxed in the act.
Plaintiff leases and pays for mailing list information. The magnetic tapes from which this information is derived by plaintiff's computer are the means by which the desired information is transmitted from the vendor to plaintiff, the purchaser. The information on the tapes is extracted by plaintiff's computer in a matter of minutes and stored in the memory units of that computer. The tapes are then promptly returned, unchanged, to the lessor. The acquired information is used shortly thereafter by plaintiff for addressing and for personalizing mailings. In most cases, no further use can be made of the mailing list data without additional payments to the vendor. Plaintiff pays no specific charge for or deposit on the tapes themselves. The rental charge bears no relation to the cost of the tape or the amount of time the tape is in plaintiff's possession. The rental charges are based on the quantity and quality of the information contained on the tapes, not on the physical attributes of the tape. In purchasing mailing list information plaintiff is solely concerned with the quality and quantity of the information it is acquiring, or, in the parlance of the industry, the "pull" of a particular list, i.e., the number and nature of customers a particular list will attract. For example, plaintiff may seek lists containing the names of other companies' customers, lists of addresses from certain zip code areas, lists of persons who have been solicited but who have not purchased items from another vendor, lists of subscribers to certain publications, or lists of persons in certain age groups; and it balances the expected yield of a list against its cost. Plaintiff is not concerned about whose brand of magnetic tape will be sent, how many reels of tape will be sent or about other physical characteristics of the tapes, and those physical characteristics do not determine cost.
The fees paid by plaintiff "for the right to acquire information from magnetic tapes" ranged from $30 to $35 per thousand names. Such information is treated by plaintiff's lessors "as *500 valuable and confidential business information." The information purchased is on magnetic tapes each of which contain anywhere from 5,000 to 500,000 names and addresses. The cost of leasing one tape could therefore range from between $150 to $175 for a 5,000-name tape to between $15,000 and $17,500 for a 500,000-name tape. The approximate cost of a reel of blank magnetic tape is $10.50 for a 2,400-foot reel.
One of the exhibits submitted on this issue is a confirmation of an order from plaintiff to one of its mailing list lessors. The confirmation describes the nature of the list, the type of tape on which the information is placed, the quantity of names and the cost per thousand names. The order confirmed was for 180,000 names and addresses at a cost of $30 per thousand names, for a total of $5,400. The cost of the tape itself, namely $10.50, is 19/100ths of 1% of the cost paid by plaintiff to its lessor.
Our courts recognize the difference between tangible and intangible personal property in taxation matters: Hasbrouck v. Martin, 120 N.J. Eq. 96, 183 A. 735 (Ch. 1936); McBride v. Jersey City, 19 N.J. Misc. 637, 22 A.2d 567 (St.Bd. Tax App. 1941); and in other matters; Kruger v. Kruger, 73 N.J. 464, 375 A.2d 659 (1977) (equitable distribution); In re Armour, 11 N.J. 257, 94 A.2d 286 (1953) (will construction). The Legislature also recognizes the difference. "Personal property" is defined by the Legislature as "everything except real property." N.J.S.A. 1:1-2. Yet, in the Sales and Use Tax Act the Legislature used the words "tangible personal property," N.J.S.A. 54:32B-3(a), indicating that intangible personal property is not taxed, unless by a specific provision relating to such property as, for example, N.J.S.A. 54:32B-3(b), which deals with services. "...[A] statute ought upon the whole to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant." Household Finance Corp. v. St. Bd. of Tax App., 119 N.J.L. 230, 234, 196 A. 219 (Sup.Ct. 1937).
The act defines "tangible personal property" as "corporeal personal property of any nature," N.J.S.A. 54:32B-2, which is "personal property of a physical nature which can be touched *501 and felt and which take(s) up space requiring storage facilities." Registrar and Transfer Co. v. Taxation Div. Director, 157 N.J. Super. 532, 385 A.2d 268 (Ch.Div. 1978), rev'd 166 N.J. Super. 75, 81, 398 A.2d 1335 (App.Div. 1979), certif. den. 81 N.J. 63, 404 A.2d 1161 (1979). In the present case the information which plaintiff leases cannot be touched or felt and does not take up space. While the magnetic tapes, by which the information which is the subject of the leasing transaction is transmitted, can be touched and felt and take up space for storage, the tapes are only the method used to transfer the information or the conduit by means of which the information is transmitted from the lessor to the lessee.
Defendant argues that the disposition of this case is controlled by Application of Alan Drey Co., Inc., 67 A.D. 1055, 413 N.J.S.2d 516 (N.Y. App. Div. 1979), since our act was apparently drawn from N.Y. Tax Law § 1101 et seq. (McKinney). See N.J. Bell Tel. Co. v. Taxation Div. Director, 152 N.J. Super. 442, 450, 378 A.2d 38 (App.Div. 1977). The New York court held that mailing list brokers were liable for the collection of sales tax because the lease constituted a receipt from the sale of tangible personal property and the furnishing of information taxable under New York law. N.Y. Tax Law § 1105(c)(1) (McKinney), as quoted in the Tax Commission's determination, provides that the following transactions are taxable: "The furnishing of information by printed, mimeographed or multigraphed matter or by duplicating written or printed matter in any other manner...." (Emphasis supplied).
The determination of the New York State Tax Commission on appeal from the Sales Tax Bureau was that (1) a list of names is tangible personal property despite the storage of the list in a computer or on a magnetic tape and (2) the list is also "information" under the applicable statutory provision which imposes a tax on the furnishing of information. The court confirmed the determination.
Neither the determination nor the confirmation contained any analysis of the conclusion that computer information is tangible *502 personal property, and the case is not helpful. To the extent that the conclusion is that information is taxable, it is not applicable to the present case because our act has no counterpart to the New York statute taxing the furnishing of information.
In support of its position that the leasing of computer information is not taxable plaintiff cites a number of cases in its brief and in a supplement thereto which relate to software and urges them as the basis for a conclusion that its leasing of information is not taxable. See Dist. of Columbia v. Universal Computer Assoc., Inc., 465 F.2d 615 (D.C. Cir.1972); Commerce Union Bank v. Tidwell, 538 S.W.2d 405 (Tenn.Sup.Ct. 1976); First National Bank of Fort Worth v. Bullock, 584 S.W.2d 548 (Tex.Civ.App. 1979); Alabama v. Central Computer Services, Inc., 349 So.2d 1160 (Ala.Sup.Ct. 1977); First Nat'l Bank of Springfield v. Revenue Dept., 85 Ill.2d 84, 51 Ill.Dec. 667, 421 N.E.2d 175 (Ill.Sup.Ct. 1981).
Software is computer programming. It is the coded sets of instructions which tell computers what to do and how. More precisely, software is defined as:
A set of computer programs, procedures, and possibly associated documentation concerned with the operation of a data processing system; e.g., compilers, library routines, manuals, circuit diagrams. Contrast with hardware. [Davis, Information Processing Systems (2 ed. 1981, 489]
In the early development of computers the word "hardware" was used to refer to a computer's physical components, that is, the tubes, relays, resistors, wires and chasis.
It soon became popular within the computer industry to use the word "software" to describe the nonhardware components of the computer, in particular the programs that were needed to make the computers perform their intended tasks. The word "software" caught on rapidly and was in quite general use by 1960. One speaks of software people, software shops (i.e., organizations that produce software), software maintenance and more recently, software engineering. Actually, software is a very general term that includes many areas.... The more significant are operating systems, programming, and programming languages. [Encyclopedia of Computer Science 641 (A. Ralston and C.L. Meek eds. 1976)].
Information and data are also defined in the computer industry:
Information may be defined as knowledge, especially as it provides people (or machines) with new facts about the real world. Data may be defined as physical symbols used to represent information for storage, communication, or processing. To determine what data to use, it is important to decide what information the data is to represent.

*503 Data processing is used to produce data that provides people with information to support their decisions or actions. [Encyclopedia of Computer Science, supra, at 641].
In this context, information is "The meaning that a human assigns to data by means of the known conventions used in their representation." Information Processing System, supra, at 489. Information and data are the subjects of the transactions in this case.
Considering the distinction between software and information, the software cases are applicable by analogy but are not completely dispositive of the issue before this court. However, cases which deal with information are directly applicable.
In Fingerhut Products Co. v. Revenue Comm'r., 258 N.W.2d 606 (Minn.Sup.Ct. 1977), the taxpayer, a direct mail merchandiser of a wide range of consumer products, obtained names and addresses of prospective customers from mailing lists that were rented from mailing-list brokers. The lists reflected a broad spectrum of demographic data, such as income, family size, location and history of mail order purchasing. The names and addresses supplied by the broker were intended for one-time use only. The applicable Minnesota statute imposed a use tax "for the privilege of using, storing or consuming in Minnesota tangible personal property." Minn. Stat. 297A.14. The issue before the court was whether the mailing lists were "tangible personal property" within the meaning of the statute. The information came to the taxpayer from the broker in the form of Cheshire tapes, gummed labels, heat transfers and typed mailing lists. The court concluded that the tax was properly imposed on the use of the Cheshire tapes, gummed labels and heat transfers but that the typed lists themselves were not taxable. In reaching its conclusion the court said that in the case of the tapes, labels and heat transfers, the physical manifestation of the property is itself used. However, in the case of the mailing lists, the court said that it was dealing with incorporeal information and that the use of the tangible medium of typed mailing lists was merely incidental to the use of that information. The court referred to Dun & Bradstreet v. New York City, 276 N.Y. 198, *504 11 N.E.2d 728 (Ct.App. 1927). In that case the taxpayer was in the business of supplying its subscribers with highly confidential information regarding the financial standing of persons engaged in various businesses. The New York Court of Appeals refused to allow the City of New York to tax the value of a reference book given free of charge to taxpayer's customers and used two factors to distinguish tangible personalty from intangibles in the sales tax field: (1) the purchaser's ability to use the information received was limited and (2) the physical properties of the book by which the information was transmitted were incidental to the services performed, that is, the information supplied. The court then reviewed the tests developed to distinguish the sale or use of intangible services from tangible personalty. In Commerce Union Bank v. Tidwell, supra, that court contrasted the value of the tangible format with the value of the item sold. The transitory or temporary value of the item sold, like information which has a very short useful life, was considered in Williams & Lee Scouting Service, Inc. v. Calvert, 452 S.W.2d 789 (Tex.Civ. App. 1970). A final consideration is whether the transaction could be achieved without the intervention of a tangible medium, as by means of electronic transmission through telephone lines.
A similar result was reached in Janesville Data Center, Inc. v. Wisconsin Rev. Dept., 84 Wis.2d 341, 267, N.W.2d 656 (Sup.Ct. 1978), involving statutory provisions dealing with the sale at retail of tangible personal property, Wis. Stat. § 77.52(1), and the furnishing of certain services, Wis. Stat. § 77.52(2)(a)(11). The wording of these statutes is similar to our statutes on such sales, N.J.S.A. 54:32B-3(a), and on such services, N.J.S.A. 54:32-3(b). The taxpayer was in the business of transferring to key punch cards and magnetic tapes data furnished by its customers for use by the customers in their computers. The customers' data was translated into codes which a computer can read by punching holes in key punch cards or by inserting magnetic bits in a particular arrangement on magnetic tapes. The cards and tapes were then delivered to the customers to be read by a computer, and the information was retained in the "memory" of the *505 customers' computers. While the court felt that tangible personal property, that is, cards, tapes or printouts, was transferred, the essence of the transaction between the taxpayer and its customer was the purchase of coded or processed data, an intangible. The court referred to Bullock v. Statistical Tabulating Corp., 549 S.W.2d 166 (Tex.Civ.App. 1977), and the object of the transaction or essence of the transaction concept referred to therein and the observation made by the Texas court that the coded data could be transmitted in several forms, i.e., by tapes, by telephones and on cards. The court then determined that the described transactions between the taxpayer and its customers were not taxable.
Plaintiff and defendant each cite various Ohio cases in which the Ohio Supreme Court used a "real object" test to determine taxability. In Accountants Computer Services, Inc. v. Kosydar, 35 Ohio St.2d 120, 298 N.E.2d 519 (Sup.Ct. 1973), the court said that in order to determine the taxability of a transaction involving computer services, it "must examine the real object sought by the buyer." 298 N.E.2d at 527. The test was developed under a provision of the law urged by the taxpayer as the basis for its claim that the transactions were not taxable. Ohio law excepts from taxation professional, insurance or personal service transactions which involve the transfer of tangible personal property as an inconsequential element, for which no separate charges are made." R.C. 5739.01(B) (128 Ohio Law 421, 424) As to the reasons for enacting this section the court commented:
The problem lies in the fact that most transactions, to at least a limited extent, involve a mixed degree of some personal service and the transfer of some tangible personal property. No doubt, the difficulty of endeavoring to separate the entire charge in all mixed transactions, and the insignificant dollar amount of tax which would be realized by taxing inconsequential amounts of personal property, prompted the General Assembly to enact the so-called "personal service exception." [298 N.E.2d at 525; emphasis in original]
In this case the taxpayer was a data processing company which took raw data in the form of paper punch tapes and adding machine tapes supplied by its customers, rearranged the data, and printed out the rearranged data as hard copy in the form of financial statement drafts, books of original entry, cash receipt *506 journals, sales journals, cash disbursement journals and general ledgers. The hard copy was delivered to the customer and used, in that form, by the customer as part of the its financial records. The court concluded that the end product, or real object, sought by the customer was the hard copy, i.e., tangible personal property, the sale of which was held taxable.
The test has been applied to hold the following transactions taxable on the basis that the transfer of tangible property was the real object: the sale of cards and printouts of data processing results, Lindner Bros. v. Kosydar, 46 Ohio St.2d 162, 346 N.E.2d 690 (Sup.Ct. 1976); the providing of computer printouts of bank transactions, Miami Citizens Nat'l Bk. & Tr. Co. v. Lindley, 50 Ohio St.2d 249, 364 N.E.2d 25 (Sup.Ct. 1977); the providing of printouts of daily banking transactions, Citizens Financial Corp. v. Kosydar, 43 Ohio St.2d 148, 331 N.E.2d 435 (Sup.Ct. 1975).
In other Ohio Supreme Court cases the court has held that the transfer of tangible personal property was an inconsequential element of the underlying transaction and that the true object sought was a service. Such transactions were not held taxable as follows: the sale of reports involving business analysis, Central Data Systems v. Kosydar, 35 Ohio St. 120, 298 N.E.2d 519 (Sup.Ct. 1973); the sale of marketing or rating reports, Andrew Jergens Co. v. Kosydar, 35 Ohio St.2d 120, 298 N.E.2d 519 (Sup.Ct. 1973); the sale of wire service news reports, Avco Broadcasting Corp. v. Lindley, 53 Ohio St.2d 64, 372 N.E.2d 350 (Sup.Ct. 1978), and the sale of credit reports, Credit Bureau of Miami Cty., Inc. v. Collins, 50 Ohio St.2d 270, 364 N.E.2d 27 (Sup.Ct. 1977). In the latter case the court ruled that all credit reports, oral or written, were exempt from tax, saying:
... it is our conclusion that the true object sought by appellant's customers is the credit information communicated by the report. Although, as a matter of convenience or preference, a written report may be requested, it is the receipt of information which necessarily constitutes the sine qua non of the transaction between the consumer reporting agency and the person to whom such information is communicated. [364 N.E.2d 30]
*507 In Fingerhut and Janesville the real object test was the result of a judicial interpretation of the taxing statutes. Such an interpretation is consistent with the provisions of our act which provides that a sale is "any transfer ... for consideration...." N.J.S.A. 54:32B-2(f). Here the court finds, based on stipulations between the parties, that there was no consideration for the magnetic tapes themselves. In Accountants Computer Services Inc. v. Kosydar, supra, the real object test was the result of a legislative enactment, R.C. 5739.01(B) (128 Ohio Law 421, 424), supra. Our act contains precisely the same words. Retail sales do not include:
Professional, insurance, or personal service transactions which involve the transfer of tangible personal property as an inconsequential element, for which no separate charges are made. [N.J.S.A. 54:32B-2(e)(3)(A)]
Plaintiff is not subject to sales or use tax when it leases mailing lists. The leasing of computer information is not the leasing or sale of tangible personal property and is not taxable under our act.
Plaintiff is leasing information. It is not leasing tangible personal property. The tapes which are tangible personal property and which transmit the information are only incidental to the underlying transaction between the parties. Fingerhut Products Co. v. Comm. of Revenue Comm'r, supra. The tapes are an inconsequential part of the transaction whose real object is the obtaining of mailing list information. Janesville Data Center, Inc. v. Wis. Rev. Dept., Accountants Computer Services, Inc. v. Kosydar, both supra. In fact, the parties stipulated that it is possible to dispense with the delivery of tapes altogether and to transmit the mailing list information by telephone from one computer to another. Under such circumstances the form of delivery of the information should not control its taxability. The inconsequential aspect of the magnetic tapes in the subject transactions may be compared to the inconsequential aspect of the paper used in connection with an accountant's services by way of reports or with an attorney's services by way of wills, other legal documents or letters giving advice.
*508 Since the real object of the transaction involves intangible personal property, it is not taxable under those provisions of our act dealing with tangible property. Defendant relies on his regulations in further support of his position. The regulations, however, do not require a different result.
Defendant cites various regulations concerning the application of the act to transactions involving data processing. N.J.A.C. 18:24-25.1 and 2. The regulations now provide:
Software, whether placed on cards, tape, disc pack or other machine readable media, or entered into a computer directly, is considered intangible personal property for sales tax purposes, and as such its sale is not subject to New Jersey State sales and use tax. Software or programs which do not meet the criteria are subject to tax. The person selling nontaxable software is required to pay the applicable sales or use tax on any tangible personal property transferred to the customer in connection with the nontaxable service. In addition, the hardware and supplies used to develop nontaxable software are not eligible for any sales tax exemptions. [N.J.A.C. 18:24-25.2(b)(2)(iv)]
The regulations also provide that the following transactions are taxable:
(i) The sale of addressed labels purchased by a customer for use in soliciting business, mailing advertisements or any similar purpose [N.J.A.C. 18:24-25.2(a)(3)(i)];
(ii) Sales of computer prepared mailing lists. [N.J.A.C. 18:24-25(a)(3)(ii)]
In these regulations there is an implied recognition of the division of a transaction into tangible and intangible property as in the real object test. N.J.A.C. 18:24-25.2(b)(2)(iv), supra.
There is no statutory basis for this regulation if it taxes "the transfer of tangible personal property as an inconsequential element" of a personal service transaction, in view of the provisions of N.J.S.A 54:32B-2(e)(3)(A).
Although there is a distinction between software and information, both are considered intangible personal property and no good reason appears for the defendant's distinction between the two for tax purposes. The use of N.J.A.C. 18:24-25(a)(3)(ii), supra, as the basis for imposing a tax in the present matter is therefore rejected. It is not even clear whether this latter regulation actually covers sales and leases of magnetic tapes *509 with mailing list data or is intended to tax tangible mailing lists printed by a computer, i.e., "computer-prepared," typed lists on sheets of paper. Without considering the taxability of printed mailing lists, to the extent that the regulation is intended to tax mailing list data on computer tapes it is beyond the scope of the act and invalid.
While administrative interpretations of statutes are entitled to weight, the courts of New Jersey have been vigilant in insuring that executive agencies do not usurp the functions of the Legislature and the judiciary by interpreting and applying statutes in a way unwarranted by or inconsistent with the legislation itself. In Service Armament Co. v. Hyland, 70 N.J. 550, 362 A.2d 13 (1976), the Supreme Court interpreted a provision of the New Jersey Gun Control Law of 1966. The court was asked to adopt the interpretation of the statute followed for many years by the Attorney General, but it declined to do so. Similarly, in AMR Realty Co. v. Securities Bureau, 149 N.J. Super. 329, 373 A.2d 1002 (App.Div. 1977), app. dism. after remand, 153 N.J. Super. 84, 379 A.2d 59 (1977), the Appellate. . Division refused to follow the Bureau of Securities' interpretation of the New Jersey Uniform Securities Law, cited Service Armament Co. v. Hyland, supra, and said:
We are fully conversant with the long established principle that the interpretation of a statute by the agency responsible for its enforcement is entitled to deference. Passaic Daily News v. Blair, 63 N.J. 474, 484 [308 A.2d 649] (1973). But we are in no way bound by such interpretation, for the construction of a statute is a judicial not an executive function, "and the qualification to the familiar principle that administrative construction should be accorded considerable weight is as well-established as the principle itself." [149 N.J. Super. at 337, 373 A.2d 1002]
A sales tax regulation issued by defendant was invalidated in Automatic Merchandising Council of N.J. v. Glaser, 127 N.J. Super. 413, 317 A.2d 734 (App.Div. 1974), cited with approval by the Supreme Court in the Service Armament Co., supra. Automatic Merchandising dealt with a rule of defendant, later codified as a regulation, which imposed a tax on the sale of certain foods. The court examined the language of the statute to which the *510 rule applied, concluded that the rule was inconsistent with it and rejected the director's reasoning. It was not justified by the statute and amounted to an impermissible amendment of the statute by regulation.
Defendant also argues that the rental of mailing lists on magnetic tapes is subject to sales tax as a taxable advertising service. A tax is imposed on:
Advertising services except advertising services for use directly and primarily for publication in newspapers and magazines. [N.J.S.A. 54:32B-3(b)(5)].
Defendant cites Fisher-Stevens, Inc. v. Taxation Div. Director, 121 N.J. Super. 513, 298 A.2d 77 (App.Div. 1972), certif. den. 62 N.J. 575, 303 A.2d 328 (1973), which held that mailing services were taxable advertising services, including the cost of selecting a mailing list, printing and applying of mailing labels, folding advertising materials and inserting them in envelopes, sorting and bundling envelopes by geographic area and placing the materials in the mail.
In the present case plaintiff's suppliers do not supply any advertising services to it. The taxation of the supplying of information does not follow from Fisher-Stevens, Inc., in which the court said:

Websters Third New International Dictionary (Unabridged 1966) defines advertising as "the action of calling something (as a commodity for sale, a service offered or desired) to the attention of the public esp. by means of printed or broadcast paid announcements." Under this definition appellants' activities would qualify as advertising services. They are intimately involved in "calling something to the attention of the public," whether it be a product for sale or civil defense regulations. [at 518]
Advertising is also defined in 2A C.J.S., Advertising, at 128 (1972) as a
... means or method of attracting public attention, and, as presently understood, covers many means of seeking to develop in the public an interest in matters or items. It has been characterized as being merely identification and description, apprising of quality and place; it is not limited to notices for commercial purposes, and it has been said not to require that it be done by or on behalf of the person who has the advertised goods to sell. It may be oral as well as in written or printed form, and may include publication by hand bills, signs, billboards, sound trucks, and radio.

*511 Originally the word "advertising" meant noticing or observing, but gradually this meaning was extended, and it is now defined as meaning making public intimation or announcement or anything whether by publication in newspapers, or by handbills, or by oral proclamation. [Emphasis supplied; footnotes omitted]
In State v. Cusick, 248 Iowa 1168, 84 N.W.2d 554 (Sup.Ct. 1957), the court cited Carter v. State, 81 Ark. 37, 98 S.W. 704 (Sup.Ct. 1906), and defined "advertise" to be
... [t]he act or practice of bringing anything, as one's wants or one's business, into public notice, as by paid announcement in periodicals, or by hand bills, placards, etc., as to secure customers by advertising.... [248 Iowa 1168, 84 N.W.2d at 556]
Each definition requires the dissemination of some information to the public. In the present case the mailing list lessor does not engage in any dissemination of the catalogs. The lessor does not call anything to the attention of the public. The lessor supplies mailing list information for use in a computer. Such information is only one component of advertising.
Since the transactions are not advertising services, they are not taxable under the section of our act dealing with advertising services.
Absent specific provisions in the tax law, the court may not extend the law to make the subject transactions taxable. In Gould v. Gould, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211, 213 (1917), the court said:
In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against government, and in favor of the citizen.
Gould was cited with approval in Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 528, 197 A.2d 673 (1964), in which the court said that [t]he legislative body must express its intention to tax in distinct and unambiguous language." Id. at 529-530, 197 A.2d 673. Public Service etc., Transport v. Tax App. Bd., 115 N.J.L. 97, 178 A. 550 (Sup.Ct. 1935). "[N]o tax may be assessed by implication." Accountants Computer Services, Inc. v. Kosydar, supra, 298 N.E.2d at 524. "[A] tax cannot be imposed *512 without clear and express language for that purpose." Janesville Data Center, Inc. v. Wis. Rev. Dep't., supra, 267 N.W.2d at 658.
Such unambiguous expression is perhaps nowhere more important in the modern world of technology than in the computer industry and its various components involving hardware, software and information. Outmoded and inadequate concepts and tools are used to deal with computer-age problems, and the taxation of computer services is an example. Computer services, particularly software and information services, are different from other property rights. It is not sensible to apply concepts such as tangible and intangible, applicable to a very different world, to the computer world. Even the distinction between property and services is not helpful here where definitions appropriate to the subject matter of the tax are needed. Significant tax burdens should not be predicated on largely irrelevant concepts developed in different times for different purposes. In Wessel, Freedom's Edge, "Controlling the Computer," 123, 126 (1974), the author discussed the industry, its size, and the dollar volume of its business and said:
With such a valuable property there is little wonder that financially pressed State and local government authorities are beginning to give attention to its taxation. [at 123]
The author then dealt with the physical, electronic and scientific aspects of the industry and the difficulties engendered by attempting to apply traditional legal concepts to antitrust, patent and taxation problems in the industry and said:
It doesn't make sense to predicate significant consequences on the outcome of debates regarding largely irrelevant concepts developed in different times for different purposes. Software is precisely the same thing whether it is classified as "tangible" or "intangible." [at 126]
In reaching the result here the court does not hold nor even imply that our Legislature could not, if it chose to do so, tax the leasing of information used in the lessee's computer. See Fingerhut Products Co. v. Revenue Comm'r, supra, 258 N.W.2d at 610, n. 5.