ANDREW, J. T. C.
Are the receipts from the retail sales of ski boots taxable under the Sales and Use Tax Act (the act), N.J.S.A. 54:32B-1 et seq.? Defendant, Director of the Division of Taxation, answered this question affirmatively, and plaintiff Ski Haus, Inc., contests that determination and asserts that it is not liable under the act for sales tax on ski boots which it sold.
Since 1970 plaintiff, a New Jersey corporation, has operated a retail store in Little Silver, New Jersey, selling essentially ski equipment and clothing. Following a Department of Taxation audit of plaintiff’s business for the period April 1,1976 to March 31, 1979, defendant notified plaintiff by letter dated February 26, 1980 that plaintiff owed a sales tax deficiency of $12,415.06 plus penalty and interest. The deficiency assessed by defendant arose out of plaintiff’s failure to collect, report and remit tax, primarily on the sale of ski boots.
Plaintiff regarded this merchandise as footwear and, based upon its reading of NJ.S.A. 54:32B-8(d)[1] (hereinafter § 8(d)), its interpretation of the administrative regulations promulgated under that section, and possibly upon the advice of its accountants,[2] believed that ski boots were exempt from the sales tax. *29 Plaintiff never sought an advance statement from defendant as to the taxability of ski boots, and until the audit took place in 1979 was not aware that its business practices might be in violation of the act. See N.J.S.A. 52:14B- 8. Plaintiff has paid the amount claimed to be due and now seeks a refund.
N.J.S.A. 54:32B--3(a) imposes a tax upon the receipts from every retail sale of tangible personal property unless otherwise exempted from taxation by another section of the act. Section 8(d) exempts from the sales tax:
Sales of articles of clothing and footwear for human use except articles made of fur or the hide or pelt of an animal or animals where such fur is the component material of chief value of the article. “Clothing” as used herein, shall also mean and include sales to noncommercial purchasers of common wearing apparel materials intended to be incorporated into wearing apparel as a constituent part thereof, such as fabrics, thread, knitting yarn, buttons and zippers. The director shall prescribe regulations to carry out the provisions of this subsection. [Emphasis supplied]
Plaintiff sets forth three arguments to establish that the sale of ski boots is not a taxable event. First, plaintiff urges that, by its terms, § 8(d) exempts “clothing and footwear” from taxation and that the statute does not authorize defendant to tax footwear according to its use in connection with an athletic activity. Defendant responds that the regulations promulgated pursuant to § 8(d) and which appear at N.J.A.C. 18:24-6.1 et seq. are a valid exercise of administrative authority, and that ski boots are taxable items under those regulations.
Second, plaintiff contends that even if these regulations are valid, defendant was required by § 8(d) to resolve by regulation any ambiguity created by the exemption, and that defendant’s failure to list ski boots in the regulations as taxable athletic equipment constitutes an intentional exclusion rather than an inadvertent omission. Defendant asserts that ski boots are clearly taxable under a reasonable reading of the regulations.
Plaintiff, however, strongly suggests that defendant’s failure to name ski boots as taxable items in the regulations will work an inequity, since, had plaintiff known that defendant regarded the merchandise as taxable, plaintiff could have collected the tax from its customers. Under the circumstances, plaintiff has *30 been required to pay the assessed amounts from its own funds, rather than serve as the collection agent contemplated by the act. N.J.S.A. 54:32B-12.
Finally, plaintiff argues that, in any event, ski boots are not taxable because they are adaptable for general use within the meaning of defendant’s regulations, while defendant, of course, contends they are not. Each of plaintiff’s contentions will be considered in the order advanced by plaintiff.
I
Plaintiff emphasizes that an administrative agency may not extend a statute beyond its language to expand its effects, or to include persons not intended by the Legislature. Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 529, 197 A.2d 673 (1964). This is particularly true with respect to the administrative interpretation of tax statutes. Ibid., citing Gould v. Gould, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211, 213 (1917).
However, the principle which is more appropriate in this case, and which the courts in this State have consistently recognized, is that tax exemptions are to be strictly construed against the claimant, because such exemptions represent a departure from the proposition that all. property should bear its just and equal share of the public burden of taxation. Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961); Julius Roehrs Co. v. Tax Appeals Div., 16 N.J. 493, 497—498, 109 A.2d 611 (1954). Plaintiff has failed to see that the act itself presumes taxability and places the burden of proving that a receipt is not taxable upon the person required to collect the tax or upon the customer. N.J.S.A. 54:32B-12(b). Spencer Gifts, Inc. v. Taxation Div. Director, 3 N.J.Tax 482, 489, 182 N.J.Super. 179, 440 A.2d 104 (Tax Ct.1981).
Our Supreme Court, in New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 560-563, 384 A.2d 795 (1978), summarized the standards applicable to judicial review of the validity of regulations promulgated by an administrative agency. Those which are pertinent to this case are:
*31 (1) Administrative regulations are to be accorded a presumption of reasonableness, and the attacking party bears the burden of demonstrating that the regulations are arbitrary, capricious, unduly onerous or otherwise unreasonable. Id. at 561, 384 A.2d 795.
(2) Regulations must be within the fair contemplation of the enabling statute, but the court is not confined to a consideration of the statutory authority for a particular regulation, but may consider the entire enabling legislation. Id. at 561-562, 384 A.2d 795.
(3) The grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities, and the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent. Id. at 562, 384 A.2d 795.
(4) Courts are not free to substitute their judgment as to the wisdom of a particular administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable. Id. at 562-563, 384 A.2d 795. See, also, Sorenson v. Taxation Div. Director, 2 N.J.Tax 470, 474-475, 184 N.J.Super. 393, 446 A.2d 213 (Tax Ct.1981).
Applying these standards, it does not appear that defendant exceeded his authority in promulgating the regulations in question, which, in effect, narrowed the broad statutory words exempting clothing and footwear. In Kingsley v. Hawthorne Fabrics, Inc., supra, relied upon by plaintiff, the court invalidated an expansive, rather than a narrow reading of a statute, which, in any event, did not involve a statutory exemption from taxation. The Kingsley court had before it a regulation that was inconsistent with the ordinary and primary meaning of the relevant statutory language, and the court held that a regulation may not extend a statute to include persons not intended. There is no apparent inconsistency here. Moreover, plaintiff has failed to make any showing of such.
*32 In the absence of a specific intent to the contrary, words in a statute are to be given their ordinary and primary meaning. Kingsley, 41 N.J. at 526, 197 A.2d 673; Julius Roehrs Co. v. Tax Appeals Div., supra 16 N.J. at 497, 109 A.2d 611. “Clothing” has been defined as:
Dressing; garments in general; clothes, dress, raiment, covering. [Webster’s New International Dictionary of the English Language (2 ed.1961),. 507]
“Footwear” has been defined as:
Wearing apparel for the feet, especially boots, shoes, etc. [Id. at 984]
While ski boots are literally within these definitions, § 8(d), as well as the entire enabling legislation, evinces a specific intent that the exemption should not be applied so broadly. Notably, § 8(d) is the only exemption section in the act which specifically commands the Director to prescribe appropriate regulations.[3] The statutory language demonstrates that the Legislature did not wish to deal with the details of this specific exemption provision but rather enabled and specifically required the Director of the Division of Taxation to establish the regulatory framework to implement the exemption provision.
That the Legislature included such a directive within § 8(d) indicates that some articles which possibly might be labelled clothing or footwear were not intended to be included within the exemption. As pointed out by defendant, the regulations are consistent with a legislative intent to exempt one of the necessities of everyday life within the context of a major revenue measure. The regulations are within the fair contemplation of the delegation of the act, and plaintiff having failed to show that they are arbitrary, capricious, unduly onerous or otherwise unreasonable, they must be considered a valid exercise of administrative authority.
*33 II
Plaintiff insists that an “obvious ambiguity” exists as to the categorization of ski boots under the regulations, and that ski boots, if taxable, should have been specifically included in the list of taxable athletic equipment in N.J.A.C. 18:24-6.5(a). The short answer to this contention is that N.J.A.C. 18:24-6.5(a) clearly states that the list is not inclusive. Considering the group of regulations as a whole, a fair and reasonable reading of the regulations indicates that only articles of clothing and footwear ordinarily worn in the course of everyday living were intended to be exempt from taxation.
N.J.A.C. 18:24-6.2 defines the exempt items as those “customarily worn on the human body.” Taken by itself, this definition may be somewhat ambiguous. “Customary” has been defined as
. .. agreeing with, or established by, custom; established by common usage; habitual [Webster’s New International Dictionary of the English Language (2 ed.1961), 651; emphasis supplied].
Ski boots are worn on the human body, but not habitually.
The regulations which follow N.J.A.C. 18:24-6.2 clarify that definitional section. N.J.A.C. 18:24-6.3 lists articles deemed exempt from the tax. For the most part, the items included are those that commonly would be considered suitable for everyday wear in the ordinary course of living. Overshoes, hightop shoes for outdoor use, safety shoes, sneakers and tennis shoes are listed.[4]
N.J.A.C. 18:24-6.4 provides that clothing and footwear used in connection with sporting activities or pastimes which are not adaptable to the use set forth in § 6.2 are not to be considered tax-exempt clothing and footwear. Since this utilizes by refer *34 ence the definition of “customarily worn on the human body,” as shown in § 6.2, it does not advance this analysis.
N.J.A.C. 18:24-6.5, however, is quite specific. Section 6.5(a) states that athletic equipment worn only in conjunction with the particular activity for which it is designed is subject to the sales tax, and designates footwear such as bowling shoes, fishing boots, golf shoes, track shoes and cleats as taxable. Ski boots are not among the items listed. Section 6.5(b) provides that articles which may be worn for general use not exclusively connected with a sporting activity are exempt. The section lists eight categories of nontaxable items, including “overshoes, coats, mittens, parkas and trousers sometimes sold in the trade as hunting, skating and skiing apparel, but suitable for general outdoor wear and commonly worn other than in a particular sport.” The examples contained in both subsections are explicitly deemed illustrative and not exclusive.
Read together, a reasonably prudent person would be led to conclude that what was intended to be exempt are those articles of clothing and footwear which are worn customarily, in the sense of habitually or in the course of everyday living. What was intended to be taxable are those items which, while worn on the human body, are worn only for the purpose of engaging in a particular sport or athletic activity. The regulations are not unreasonable, arbitrary, capricious or unduly onerous because they fail specifically to name ski boots as taxable athletic equipment.
Bolstering this conclusion is plaintiff’s admission that it never considered skis to be exempt, even though skis are worn on the feet, but are not included on the list of taxable sports equipment. Plaintiff’s failure to seek an advance determination from defendant as to the taxability of ski boots also detracts from its argument that the proper category for ski boots was ambiguous.[5] While defendant’s regulations could have been more art *35 fully phrased, their intent was sufficiently clear. Plaintiff could have avoided the liability imposed by the act at N.J.S.A. 54:32B-14, which it claims is unjust, by a reasonable reading of the regulations, or by requesting an advance ruling from the defendant.
Ill
Finally, plaintiff seeks to prove that ski boots can be worn for general use not exclusively connected with a sporting activity, and that the sales of ski boots are exempt by the terms of N.J.A.C. 18:24-6.4 and 18:24-6.5(b).
Plaintiff presented various models of ski boots. Although the four models of modern downhill boots exhibited had different features, they were all basically constructed in a similar manner. Each consisted of a rigid plastic outer shell, and a soft inner bladder or “bootie.” The hard shell is made in relatively few sizes and the boot is fit to the foot principally by means of the inner bladder, which comes in sizes comparable to those of ordinary shoes. The inner bladder also provides a measure of comfort and warmth that an outer shell worn alone could not.
One of the exhibits had a removable black rubber heel on the outer shell which could be replaced when worn down. Plaintiff’s and defendant’s witnesses agreed that the boot will not operate well as a ski boot with a worn heel because the boot will not properly interface with the ski binding. The removable heel makes it possible simply to replace worn heels rather than having to purchase a new pair of ski boots. Another boot had a hard plastic insert on the heel designed to minimize the wear on the bottom of the ski boot. The inner bladder of a third boot had a walking sole. Plaintiff’s witness, its major shareholder, Gordon D. Donald, who described himself as an experienced skier, indicated that skiers would sometimes remove the outer rigid shell and walk around wearing only the bootie.
*36 Donald testified as to comfort features incorporated into the designs of the downhill boots. One boot had a spring in the top portion of the outer rigid shell, allowing the wearer to regulate the degree and tension of the forward flex of the ski boot. In downhill, or alpine skiing, the skier normally leans forward, and the boots are designed to provide some degree of forward flex to accommodate that position. Another boot had a top buckle that, when opened, permits the wearer to stand up straight and walk in a conventional manner rather than in the flexed-forward posture. Still another boot had a zipper-like device in the back of the boot; when the zipper is open, the wearer can stand up straight and comfortably for walking, rather than with the forward lean suitable for skiing.
None of the witnesses identified the material from which the cross-country, or Nordic ski boot, was manufactured. Defendant’s expert, John Perryman, a consulting engineer to the ski industry, described the cross-country boot as being quite flexible and low, with a squared-off toe; the sole of the boot, a standard type, has three holes for a three-pin receptacle toe piece, permitting the boot to be attached to the ski binding. There is no forward flex built into the cross-country boot.
Plaintiff’s witness, Joan Donald, a stockholder in the corporation and involved in the operating of plaintiff’s store, stated that, in its strict sense, the purpose of the ski boot is to attach a pair of skis to the body, but that the boot can be worn alone, without skis. Donald, Mrs. Donald and Charles D’Emery, the general manager of plaintiff’s store, all testified that they frequently visited ski centers and resorts. They related that it is a common practice at these places for persons to put their ski boots on in the morning, wear them to the slopes, when going out to eat, while shopping, while driving and while engaged in numerous other activities in and about the ski center. Mrs. Donald stated that she and her husband had gone to parties and bars while wearing ski boots, but only when coming directly from the ski slopes.
*37 Generally, wearers do not remove their boots until they return to their living or sleeping accommodations at the ski center. Plaintiff’s witnesses also indicated that this practice is primarily one of convenience, since it is difficult to take the boots off and then put them on again when returning to the slopes, and also because of the possibility of losing the boots when they are not on the feet. Wearing the boots all day also obviates the necessity of carrying around a second pair of shoes.
Plaintiff’s witnesses admitted that one would not wear ski boots while walking around in downtown Little Silver, where plaintiff’s store is located, nor would one wear the boots for long-distance driving. Defendant’s expert testified that ski boots were worn for walking at ski resorts but that, in his experience, skiers got out of their boots as quickly as they could.
Plaintiff’s witnesses testified that “walkability” is a primary factor in the selection of ski boots, and that customers are encouraged to spend 15 minutes to one-half hour walking around plaintiff’s store in a pair of ski boots to ascertain whether the boots are comfortable before making a purchase. Defendant’s expert stated that the primary purpose of this try-on period is to ensure comfort while skiing, rather than walking.
When asked his opinion as to the suitability of ski boots for general use, defendant’s expert testified that the typical downhill boot was clumsy, heavy and essentially uncomfortable for anything but skiing. He added that the boots were designed for controllability and comfort while skiing, but could be walked around in to the extent that a wearer would need to in order to get to a change of shoes. He testified that cross-country boots could be worn more readily for general use than downhill boots because cross-country boots are low and flexible, but added that if the soles of cross-country boots were worn down by walking, they would no longer fit the ski bindings correctly, and the skier would lose some control while on skis.
The testimony amply supports the proposition that downhill boots are worn by themselves, and not solely with skis. It appears that this use takes place exclusively at ski resorts and *38 centers and in the areas immediately surrounding such resorts and centers. While witnesses testified that skiers participated in other activities while wearing the boots, the boots were worn for these activities only when the wearer was coming from or going to the ski slopes.
Most of the walking that is done in the boots is directly associated with the activity of skiing: getting to and leaving the slopes, standing in lines, taking some time from skiing to eat and then returning to ski. The evidence shows that it is in fact necessary for the skier to be able to walk in his boots during some portion of the day. The replaceable heel accommodates this need, while still permitting the boot to serve its function of properly interfacing with the ski binding, and was not introduced to allow the boot to be used primarily as a walking shoe.
While skiers undoubtedly want their ski boots to be relatively comfortable when they are used for walking, the purpose of the various comfort features is for the wearer to be able to go from the ski mode, with its forward flex, to the walking mode in which the leg would be held in a relatively straight position. Since the wearer must both walk and ski during the course of the day, it cannot be said that the adjustments that can be made to the boots to permit walking were incorporated into the boots’ design to make them suitable for general use. Rather, these devices permit walking which is done as part of the activity of skiing. Similarly, even when the outer rigid shell is removed, and the wearer uses the inner bladder as he would an ordinary pair of shoes, the wearer is doing so in conjunction with the walking activity associated with skiing.
Analogous to the skier is the golfer, who wears specially designed shoes (taxable under the Director’s regulations) which enable the player to have a firm stance, but who nevertheless must do some walking as part of the sport. In the case of golf, both the hitting of the ball and walking constitute the total activity. Although the golfer does not need specialized shoes to walk, he continues to wear them throughout the course of the activity. This is also true of the bowler, who may engage in any number of activities that involve physical movement other than *39 bowling while awaiting his opportunity to address the bowling pins.
From the testimony and the exhibits it is clear that ski boots are used for walking only when the skier is engaged in the sport of skiing. They are not adaptable to ordinary, everyday wear, nor are they suitable for general use. Downhill ski boots are athletic equipment normally worn only in conjunction with skiing, and are thus taxable.
There was no testimony to the effect that cross-country boots are worn other than for skiing. Although these boots are more adaptable to general wear than are downhill boots, if so worn they become unsuitable for skiing. Arguably, cross-country boots could be classified within the clothing and footwear definition of N.J.A.C. 18:24-6.4, that is, adaptable so as to be customarily worn on the human body. Cross-country boots could also come within the provisions of N.J.A.C. 18:24-6.5(b) because they may be worn for general use not exclusively connected with a sporting activity. The factual record demonstrates, however, that they are worn only in conjunction with the particular activity for which they are designed. Therefore, they are subject to the sales tax under N.J.A.C. 18:24-6.5(a).
Accordingly, the Clerk of the Tax Court is directed to enter judgment affirming the determination of the Director of the Division of Taxation.

 N.J.S.A. 54:32B-8(d) was repealed by L. 1980, c. 105, § 46, eff. September 11, 1980, but was re-enacted in substantially the same form by L. 1980, c. 105, § 16, eff. September 11,1980, as N.J.S.A. 54:32B-8.4.

Testimony by a member of the accounting firm employed by plaintiff indicated that plaintiff may have been advised that clothing was nontaxable, and that equipment such as skis was taxable. He did not recall having been asked specifically about the taxable status of ski boots. In any event, it is well established that every person is conclusively presumed to know the law, statutory and otherwise. Widmer v. Mahwah Tp., 151 N.J.Super. 79, 83-84, 376 A.2d 567 (App.Div.1977). Plaintiffs reliance, if any, on the advice of its accountant does not free plaintiff from its duty under the act.

While N.J.S.A. 54:32B-8.22, formerly N.J.S.A. 54:32B-8(w), exempting certain sales made to contractors, provides that any person seeking to qualify for the exemption shall do so pursuant to rules, regulations and on forms prescribed by the Director, it does not specifically mandate the Director to adopt regulations to implement the provisions of the exemption statute, and N.J.S.A. 54:32B-24 merely grants the Director a general power to make, adopt and amend regulations appropriate to the act and its purposes, but does not direct that he do so.

Some questionable items, such as bathing suits, and bowling shirts if suitable for ordinary wear, are also included. As noted previously, the supporting factual bases for administrative rulemaking are to be presumed until rebutted by the party attacking the administrative action. New Jersey Guild of Hearing Aid Dispensers v. Long, supra 75 N.J. at 560, 384 A.2d 795 (1978). Plaintiff does not attack the classification of bathing suits and bowling shirts as nontaxable items, but implies that ski boots are similar in use to items actually listed in the regulation.

Apparently other vendors of ski boots made such inquiries of the Director and were advised that the sale of ski boots was a taxable event. N.J.S.A. *35 52:14B 8 provides that upon the request of any interested party the Director may make a declaratory ruling with respect to any rule administered by him, which ruling would bind the agency.