LASSER, P.J.T.C.
Taxpayer, a producer of computer-generated test score results, contests a deficiency tax assessment imposed under the New Jersey Sales and Use Tax Act on the rental of computer equipment. Taxpayer contends that the rental is exempt from tax pursuant to N.J.S.A. 54:32B-8.13(a) because the equipment is used directly and primarily in the production of tangible personal property.[1]
N.J.S.A. 54:32B-8.13(a) exempts from sales and use tax:
Sales of machinery, apparatus or equipment for use or consumption directly and primarily in the production of tangible personal property by manufacturing, processing, assembling or refining____
*255 At trial the following facts were adduced. Taxpayer is a New Jersey corporation engaged in the business of preparing and furnishing by data processing, to schools, reports of the results of students’ single response, multiple choice educational test scores in grades K through 12. These reports present the student scores in many different arrangements in order to meet the schools’ requirements for evaluating student abilities.
The schools purchase tests from test publishers, administer the tests and send taxpayer batches of answer sheets organized by class. Taxpayer processes these answer sheets together with information furnished by the test publisher and incorporates the testing information, including raw scores, with other information such as class, grade, school system and national norms, as required by the school. Student performance is reclassified according to the standards submitted. The preparation and sale of the reports is accomplished in five stages, as follows:
1. Student answer sheets are received and prepared for data entry by trained clerks.
2. Answers are transferred to data tapes by computer-assisted optical scanners which analyze and edit the computer data.
3. Computers sort data, perform a syntax check and produce a data tape.
4. Computers produce reports from data tapes.
5. Reports are distributed to the schools.
The first three stages result in the production of a computer data tape which contains the test score information. Test publisher information and the information required by the client school are entered in the central processing unit (CPU), which contains programs to assemble information in one or more of a variety of formats that may be requested by the school. In the fourth stage, the CPU sorts, reclassifies and merges the information as required and instructs the printers to print reports which include the test scores and other information in various configurations. These include ranking the class by test scores, listing the class alphabetically, providing pupil profiles by combining results of a battery of tests, comparing them with national test results, and then indicating the percentage of students in the national reference group for the student’s grade *256 whose scores were above, at or below the subject student’s test score. The reports also include growth scale values, pupil profiles with learning objectives, class instructional guides, degrees of reading power, evaluation reports, school district distribution summary by percentile and an administration summary. Labels with test scores are also produced for the students’ permanent school records. About 50 different types of student test score reports are available. The average school client orders the information in approximately five different arrangements.
Taxpayer is not a test publisher, but is in competition with test publishers who also provide computer-generated test score results. The CPU data input is limited to that information submitted to taxpayer by the school and the test publisher. The school is charged a base fee for the first three stages of work, depending on the number of sheets in the test. This charge covers handling, overhead and the test publisher’s royalty fees. In addition, the school is charged a fee based on the number of students’ names on each report and the number of reports ordered.
Taxpayer’s customers are tax-exempt schools or school districts. Taxpayer does not perform services for private schools. On only four occasions were reports furnished to nontax exempt organizations, and in each case a sales tax was charged on the cost of the report.
Taxpayer regards the following equipment used in stage four as production equipment:
1. Central Processing Unit (370 IBM Mainframe)
2. Printer & Print Controllers
3. Disk Drives
4. Potter Tape Controller & Drives
5. Card Read/Punch
*257 Taxpayer does not seek exemption for any equipment used in stages one, two, three or five.[2]
The threshold issue in this case is whether taxpayer’s data processing activities are the rendering of services or the production of tangible personal property. The Director has adopted detailed sales and use tax regulations relating to data processing. N.J.A.C. 18:24-25.1 et seq. The design of these regulations is to identify in paragraph 25.2(a) those transactions which are taxable, and in paragraph 25.2(b), those transactions which are nontaxable. Included in paragraph (a) as taxable is the sale or lease of data processing equipment. Paragraph (b)l. provides that the processing of data is not taxable. The pertinent portions of the paragraph (b) regulations are as follows:
(b)l. The processing of data by a service bureau constitutes a nontaxable service whether or not the customer supplies the medium.[3] Data conversion services, whether by keyentry, keystroke verification or other entry procedure, are part of the processing of data, and whether or not forwarded to a customer, are nontaxable services.
(b)3. The following are deemed to be professional services and are, therefore, not subject to sales and/or use tax:
iv. Professional services, such as accounting services, where the service bureau initially receives the raw material and studies, alters, analyzes, interprets and adjusts such raw material which by the use of a data processing machine are sorted, classified and rearranged.
*258 (b)6. The sales and/or use tax is not applicable when the tangible personal property involved is incidental to the professional or personal services and for which no separate charges are made.
It is a general principle that exemptions from taxation are to be strictly construed against the claimant, because they represent a departure from the proposition that everyone should bear his just and equal share of the public burden of taxation. Princeton Univ. Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961); Container Ring v. Taxation Div. Director, 1 N.J. Tax 203 (Tax Ct.1980), aff’d o.b. per curiam 4 N.J. Tax 527 (App. Div. 1981), certif. den. 87 N.J. 416, 434 A.2d 1090 (1981). This principle is applicable to sales and use tax. Futurevision Cable Enters., Inc. v. Taxation Div. Director, 6 N.J. Tax 149, 161 (Tax Ct.1983).
Sales and use tax regulations are promulgated by the Director pursuant to authorization granted by the Legislature in N.J.S.A. 54:32B-24. Standards applicable to judicial review of the validity of regulations promulgated by an administrative agency were reviewed by our Supreme Court in New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 384 A.2d 795 (1978). A summary of those pertinent to the present case are:
(1) Administrative regulations are to be accorded a presumption of reasonableness, and the attacking party bears the burden of demonstrating that the regulations are arbitrary, capricious, unduly onerous or otherwise unreasonable.
(2) Regulations must be within the fair contemplation of the enabling statute, but the court is not confined to a consideration of the statutory authority for a particular regulation, but may consider the entire enabling legislation.
(3) The grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities, and the court should readily imply such incidental powers as are necessary to effectuate fully the legislative intent.
(4) Courts are not free to substitute their own judgment as to the wisdom of a particular administrative action for that of the agency so long as that action is statutorily authorized and not otherwise defective because arbitrary or unreasonable. [Id. at 561-563, 384 A.2d 795]
Taxpayer has not contested these regulations. Rather, it seeks to avoid the application of the regulations by distinguish *259 ing the facts of its activities from the scope of the regulations. In interpreting the regulations, the court must follow the direction of the Supreme Court, liberally construe the Director’s regulations, and not substitute its own judgment for the judgment of the Director.
Taxpayer contends that the computer report is tangible personal property because the report is the real object sought by the buyer.
Taxpayer further contends that its product is tangible personal property, not services, because the data processing in stage four is reclassification of data, not analysis. Taxpayer argues that analysis involves conclusions, and its processing of data in stage four is only the rearrangement of information furnished to taxpayer. Taxpayer claims that its work is merely a substitute for manual test scoring and arrangement of information that otherwise would be done by school employees.
In interpreting the Sales and Use Tax Act and the Director’s regulations promulgated to implement it, consideration must be given to the scheme of the act. In general, the tax is imposed on the sale or lease of tangible personal property. Services, with certain expressly-stated exceptions, are not taxed. Sales for resale are not taxed. Section 8.13(a) exempts the sale of machinery and equipment used in the production of tangible personal property. Limiting the exemption to production of tangible personal property insures that although the machinery is exempt, the end product is taxable. It is apparent that the Legislature did not intend to extend the exemption to services because then neither the machinery nor its product would be taxable. For this reason, the words, “processing, assembling, or refining” in the statutory definition of production do not refer to services.
The Director’s regulations provide that data processing by a service bureau is a nontaxable service. Service bureau is defined as, “an organization that processes data for others.” Taxpayer’s activities fall within this definition. Information is furnished to taxpayer for processing. After that function is *260 performed, the processed information is furnished to the customer in the form of a printout. Taxpayer’s activity is not limited to printing. Taxpayer’s activity involves all of the steps necessary to assemble, process and furnish the information to its customers. The customer does not want only the report, it wants the data processing. The customer could prepare the report itself manually at a greater cost of time and expense. The customer is buying the test scoring and the sorting, merging and integration of the test scores with information concerning class, grade, school, district and national norms, and the correlation of responses by means of answer-cluster groups. The information that the school seeks is derived from the rearrangement of the input data and the melding of test scores with the class, grade and other averages compiled by taxpayer, and the national norms supplied by the school district or the test preparer.
Printing is only the final step, not a separate purchase. This interpretation is consistent with the decision of the New Jersey Supreme Court in Metpath, Inc. v. Director, Div. of Taxation, 96 N.J. 147, 474 A.2d 1065 (1984), and the decision of the Tax Court in Spencer Gifts, Inc. v. Taxation Div. Director, 182 N.J. Super. 179, 3 N.J. Tax 482, 440 A.2d 104 (Tax Ct.1981). In Metpath the Supreme Court, dealing with an exemption provided under N.J.S.A. 54:32B-8.20 for chemicals used in laboratory analysis, held that a printed report was only incidental to the laboratory analysis, that “the sale of such a report is a sale of information and, as such, is a service, rather than a sale of tangible personal property.” 96 N.J. at 154, 474 A.2d 1065. In Metpath, Justice Schreiber placed substantial reliance on the sales tax policy of avoidance of double taxation. He stated:
Thus it can be seen that the general legislative intent was to impose the tax on sales of tangible personal property unless that property was to be resold by the purchaser. The contemplation was that the tax in such a situation would be incurred on resale. The theoretical justification for the resale exemption was “the desire to avoid pyramiding taxes as goods move along the channels of distribution toward the marketplace.” Redlich, “Sales Taxes and the Resale Exemption in the Manufacture and/or Distribution of Personal Property,” 9 Tax L.Rev. 435, 436 (1954). In furtherance of the policy against double taxation of a single product, the Act has long exempted from the tax on sales not only *261 the sale of personal property that is resold but also the sale of personal property that becomes a component part of a finished product that is then sold. [Id. at 151, 474 A.2d 1065]
This same sales tax policy is evident in the § 8.13(a) exemption, which is limited to machinery and equipment that produces tangible personal property. The machinery and equipment are nontaxable; the product, because it is tangible personal property, is subject to sales tax.
Taxpayer relies on a series of Ohio cases which established the “real object sought” test for determining whether the product of a data processing operation was tangible personal property or services. Accountants Computer Services, Inc. v. Kosydar, 35 Ohio St.2d 120, 298 N.E.2d 519 (Sup.Ct.1973), dealt with the computer-generated accountant’s “write-up work.” The court held that the printout was the “real object sought” by the buyer, that the computer merely rearranged the raw data, a task previously performed manually by the accountant. In the following cases the court dealt with printouts of activities of banking or financial institutions: Citizens Financial Corp. v. Kosydar, 43 Ohio St.2d 148, 331 N.E.2d 435 (Sup.Ct.1975); Lindner Brothers, Inc. v. Kosydar, 46 Ohio St.2d 162, 346 N.E.2d 690 (Sup.Ct.1976); Miami Citizens National Bank & Trust Company v. Lindley, 50 Ohio St.2d 249, 364 N.E.2d 25 (Sup.Ct.1977); Financial Computer Services, Inc. v. Lindley, 70 Ohio St.2d 243, 436 N.E.2d 1025 (Sup.Ct.1982) and Statistical Tabulating Corp. v. Lindley, 3 Ohio St.3d 23, 445 N.E.2d 1104 (Sup.Ct.1983). In each of these cases the computer-generated report was found by the court to be the real object of the transaction, and the report was held to be tangible personal property subject to sales tax. After the dates of the transactions involved in these cases, the Ohio Sales and Use Tax Act was amended to include the following:
The transfer of title or possession, or both, of tangible personal property, or the granting of a license to use or consume tangible personal property, by an electronic data processor in conveying the results of the electronic processing of others’ data by such processor is not a sale, and the electronic data processor is deemed to be rendering a service. [R.C. 5739.01(B), effective August 27, 1976]
The amended Ohio statute and the New Jersey regulations treat data processing in the same way — as nontaxable services.
*262 In view of the scheme of the New Jersey sales and use tax and the Director’s data processing regulations, the Ohio cases cited by taxpayer do not constitute authority in this State for the proposition that the printout furnished by taxpayer is tangible personal property for the purpose of § 8.13(a). Further, the Ohio cases no longer constitute authority in Ohio because of Ohio’s statute change.
Spencer Gifts, supra, is consistent with the design of the sales and use tax data processing regulations in holding that the lease of a data tape containing a mailing list is the lease of information, not tangible personal property, and therefore the lease is nontaxable. 182 N.J. Super. at 204-205, 3 N.J. Tax at 507-508.
I find taxpayer’s activity to be principally data processing and the report, although itself tangible, only incidental to the performance of data processing services. Therefore, pursuant to §§ (b)l and (b)6 of the regulations, taxpayer’s services and report are nontaxable.
Taxpayer seeks to separate out stage four of its activities, and argues that this stage is the production of the tangible report. However, even this stage is principally data processing. A tape is produced in the first three stages, and in the fourth stage, the tape is run on the 370 IBM computer, which performs the sort, merge and integration operations and, in addition, drives the printers which produce the printouts memorializing the results of the data processing.
Additional support for the court’s finding can be found in § (b)3iv, which defines nontaxable professional services. This section uses the words “studies, alters, analyzes, interprets and adjusts” in determining whether taxpayer is performing professional services. These words must be viewed in a data processing context and must be applied in terms of what the computer actually does. Although the computer does not think, and does not literally study, analyze or interpret, it does mimic these human mental functions by mechanically studying the data, altering, analyzing, interpreting and adjusting it. These are all *263 terms that describe computer functions, and all of these functions are performed by the computer in grading the tests and comparing those grades with other data. These activities are involved in all of the five stages necessary for the production of the report. All of the activities, from the receipt of the answer sheets to the production of the report, come within the general term “data processing.” These activities would require study, analysis, alterations, interpretation and adjustment if they were to be performed manually by the schools. As an example, alphabetization requires these activities.
I find that both the activities of stage four and the combined activities of all of the steps utilized in the production of the report are data processing steps that might be performed by a service bureau. Taxpayer’s charge is a combined charge for the physical report and the data processing services necessary to produce the report, there being no separate charge for the report itself.
Because I find that it is the data processing services that are primarily sought by the school, and that these services are both data processing and services within the definition of the regulations, I conclude that the report is incidental to these services and therefore the § 8.13(a) exemption is not applicable to taxpayer’s data processing equipment.
I find that the Director, in promulgating the foregoing regulations, has acted within the fair contemplation of the Sales and Use Tax Act, and that the deficiency assessment is made in accordance with the regulations.
Based on the foregoing, it is unnecessary for me to determine whether production of the report comes within the term “manufacturing, processing, assembling or refining,” or whether and to what extent the equipment used in stage four is used directly and primarily in the production of the report.
I conclude that taxpayer’s product is a service, which is not tangible personal property. Since the product is not tangible personal property, the data processing equipment is not exempt under § 8.13(a). The nontaxability of the product is in harmony *264 with the overall design of the Sales and Use Tax Act and the data processing regulations — the product is not subject to tax, but the sale or lease of the data processing equipment is taxable.
The Director’s deficiency tax assessment is affirmed, and the Clerk of the Tax Court is directed to enter an appropriate judgment.

 A lease of equipment is considered a sale subject to tax. N.J.S.A. 54:32B-2(f). Qualification for exemption under § 8.13(a) applies to leasing as well as sale. NJ.S.A. 54:32B-11(3).

 Although no reason was stated for not seeking exemption for this equipment, presumably it was because the equipment used in these stages is not regarded by taxpayer as production equipment.

 “Service Bureau” is defined in § 24-25.1(c) as “any organization which processes data for others, or leases or rents electronic data processing equipment, or charges for the use of such equipment by others. Among other activities, service bureaus are engaged in the production of output data.”
§ 24-25.1(c) defines "media” as "the material, or configuration thereof, on which data are recorded, such as punched cards, discs, magnetic tape and microfilm.”